**James GARTEN, Kari Garten, Harris Schwartzberg, Michael Joannou and Theresa Joannou, Plaintiffs–Appellees,**

v.

**Peter C. KURTH, Paula Rudofsky, Julia Kurth, The Peter C. Kurth Office of Architecture and Planning, P.C., MKC Construction Management Corp., Inc.,**

PGM Construction Management, Inc., KRK Construction Management, Inc., and Peter C. Kurth, AIA, d/b/a Design Works Construction, Inc., Defendants–Appellants.

Cynthia Darden, ABC Corporations Nos. 1 Through 10, John Doe Nos. 1 Through 10 (a Fictitious Name) and John Sergeant, Defendants.

Docket No. 01–7379.

United States Court of Appeals, Second Circuit.

Argued Aug. 6, 2001.

Decided Sept. 7, 2001.

David S. Pegno, Dewey Pegno & Kramarsky, New York, NY, for Appellees.

Matthew G. Roseman, Forchelli Curto Schwartz Mineo Carlino & Cohn, Mineola, NY, for Appellants.

Before MINER, CALABRESI, and CABRANES, Circuit Judges.

CALABRESI, Circuit Judge:

Defendants appeal from the decision of the United States District Court for the Southern District of New York (Charles L. Brieant, *J* .) to deny Defendants' motion to compel arbitration for a variety of claims brought by Plaintiffs with respect to a construction project on Plaintiffs' property. The district court held that threats made by Defendant Peter Kurth concerning both his ample knowledge of arbitration and the costs of arbitration for Plaintiffs were part of an effort to force Plaintiffs to over-pay for the construction project; these threats, accordingly, established a "substantial relationship" between the arbitration clause and the fraudulent scheme and warranted the court's decision not to enforce the arbitration provision. We reverse.

## BACKGROUND

In early 1998, Plaintiffs James and Kari Garten decided to have a playhouse built for their daughter behind their house. The Gartens contacted Defendant Peter Kurth, a licensed architect who had designed the Garten's home for its prior owner. At the first meeting, Mr. Kurth said that he was an experienced architect with the professional capacity to complete the project. The Gartens decided to retain Defendant The Peter C. Kurth Office of Architecture and Planning ("Architecture and Planning") as the architect for the project. On May 14, 1998, the Gartens signed an Agreement (the "Garten Agreement") with Architecture and Planning for the construction of the playhouse. This agreement contained an arbitration clause that stated:

Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

. . . .

The award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accor-

dance with applicable law in any court having jurisdiction thereof.

Following the signing of the Garten Agreement, Mr. Kurth prepared the plans for the project and provided the Gartens with an estimate of $165–$185 per square foot, for a total cost of approximately $180,000. He also told the Gartens that he would collect and submit to them proposals for the construction of the playhouse. The summary of the bids that Mr. Kurth gave the Gartens included those from Defendants MKC Construction Company ("MKC"), PGM Construction Management, Inc. ("PGM"), and Peter C. Kurth, AIA d/b/a Design Works Construction, Inc. ("Design Works"), plus bids from five other companies. MKC, PGM, and Design Works, the three lowest bidders, were all controlled by Mr. Kurth at the time of the bidding. Mr. Kurth did not inform the Gartens about his connections to these companies. Design Works' bid (and budget) of $179,572 was the lowest and was accepted by the Gartens. As a result, the Gartens entered into a Construction Management Agreement with Design Works; this agreement also contained an arbitration clause. Design Works' role was to be general contractor for the project.

Due to rising costs in the ongoing construction project, the Gartens—after paying the bills—requested an accounting around April 1999. Though they were entitled to such an accounting pursuant to the Garten Agreement, they never received it. When the Gartens had paid over $400,000, they met with Mr. Kurth to discuss the growing costs and were told that the project could be completed "in the $400,000 range." On May 15, 1999, the Gartens gave Mr. Kurth checks for two further invoices. But, the next day, upon determining that they had paid him almost $700,000, they stopped payment on the checks and contacted Mr. Kurth to review the situation.[1]

Within a few days, the Gartens met with Defendants Peter Kurth and Paula Rudofsky (Mr. Kurth's assistant) and offered $50,000 to complete the project. Mr. Kurth accepted this offer and the Gartens provided a check for $50,000 marked "full and final payment," which he cashed. Soon after, Mr. Kurth and Mr. Garten spoke again. At that time, Kurth warned Garten that more money would be needed to complete the job and that Garten would be required to pay any additional costs. He pointed out that the Gartens could not litigate the issue, but would have to go into arbitration—something he was very familiar with, but a process for which the Gartens would need to hire an attorney. Defendants did not provide further payments to subcontractors or perform any work after this point. On June 7, 1999, the Gartens terminated their relationship both with Architecture and Planning and with Design Works. Architecture and Planning then filed and served a mechanic's lien for over $50,000 against the Gartens' property; Design Works did the same for an amount in excess of $100,000. The Gartens requested an itemized statement for the liens but were given only the same invoices that they had already received.

In October 1999, Plaintiffs began this action against, *inter alia*, Defendants Peter Kurth, Rudofsky, Architecture and Planning, MKC, PGM, and Design Works alleging RICO violations as well as various

---

1. The original plans (for a playhouse, with play equipment, in the same style and quality as the Garten's home) were for an 1,100 square foot structure with no bathroom. The Gartens later approved a somewhat expanded scope for the project. They ultimately paid for a playhouse with plumbing, heating, cooling, and insulation. Even so, the playhouse was incomplete at the time that the Gartens ended their relationship with the Defendants.

statutory and common law claims sounding in fraud, malpractice, breach of fiduciary duty, and unjust enrichment. After Plaintiffs amended their complaint, Defendants[2] moved to compel arbitration under the Federal Arbitration Act and N.Y. C.P.L.R. 7503 and to dismiss the suit on the grounds of failure to state a cause of action and/or lack of jurisdiction.

In a Memorandum and Order dated October 23, 2000, the district court declined to dismiss the Amended Complaint. It denied the motion to compel arbitration with respect to Plaintiffs' claims against Peter Kurth, Darden, PGM, and Julia Kurth (the "Non–Signatory Defendants") because no agreement to arbitrate existed between the Non–Signatory Defendants and Plaintiffs. And, it reserved decision on Defendants' motion to compel arbitration for the claims against Architecture and Planning and Design Works pending an evidentiary hearing.

The court took cognizance of the existence of an arbitration agreement with these latter parties and it noted that the validity of a contract that provides for arbitration is usually an issue for the arbitrators. It further pointed out that "[t]he Federal Arbitration Act 'does not permit the federal court to consider claims of fraud in the inducement of contract generally,'" and that the "court may address allegations of fraud only if they are directed to the arbitration clause itself." Here,

however, Plaintiffs had alleged that the arbitration clauses were used to facilitate Defendants' fraud. As a result, the court stated, the question whether the fraud alleged went to the arbitration clause must be decided before arbitration can be compelled or Plaintiffs can be allowed to proceed with their claim in district court. The court's order permitted discovery solely on the issue "of fraud in the inducement of the arbitration provisions" in the contracts. And, the court stayed the action with respect to all the Non–Signatory Defendants until it could adjudicate the validity of the arbitration agreement between the Gartens and the two Defendants—Architecture and Planning and Design Works—who had signed contracts with them.[3]

The district court conducted a two-day hearing on the question. On March 14, 2001, it issued findings of fact and conclusions of law. In its decision, the court reviewed the evidence surrounding Plaintiffs' allegations. It found that the focus of the fraud alleged was the systematic overcharging of Plaintiffs for services performed by subcontractors. Thus, for invoices dated September 1998 to December 1999, Mr. Kurth had paid subcontractors $354,000 while the Gartens had paid out more than $700,000. This, the district court concluded, sufficed to "show a continuing pattern of fraud and deceit."[4] As

---

**2.** Defendant Sargeant, one of the subcontractors who is not a party to this appeal, moved to dismiss the claims or stay the action against him and compel arbitration of the other claims.

**3.** This stay operated on the claims against Defendant Sargeant, as well as all the Non–Signatory Defendants.

**4.** The court provided a detailed review of specific instances of seemingly fraudulent conduct. For example, the court found that Mr. Kurth presented the Gartens with in-

voices for "Stone Work" in the sum of $94,498.38. But, Murana Construction, the subcontractor that had done most of the work, was paid only $68,945 by Mr. Kurth. He provided no explanation for the discrepancy. During discovery, moreover, Defendants introduced an invoice for certain work in the amount of $6,250 bearing the caption of Murana. But, as the court noted, "[i]t is undisputed, however, that Murana Construction 'never sent this [invoice] as it is now.' The Murana transactions reflect a serious fraud,

to the relevance of the arbitration clause to this fraud, the court recounted in some detail the threats made by Mr. Kurth once the Gartens decided to terminate the relationship:

Defendant Kurth confronted Mr. Garten, and warned him that Mr. Garten was required to pay more than the agreed upon $50,000 and "he said that [Mr. Garten] better pay it because [Mr. Garten] really had no choice, [Mr. Garten] couldn't litigate with him, [Mr. Garten] was only going to go into arbitration with him, and that was something he knew like the back of his hand, and he could represent himself. And he said [Mr. Garten] would have to get counsel, and it would cost [Mr. Garten] money, and that was that." Defendant also threatened to contact the tax assessor and the town building department regarding the increased scope of the Garten project. Furthermore, Defendant Kurth warned that if Mr. Garten did not go along with him and pay more money, that Mr. Kurth would refuse to allow the Gartens to get a certificate of occupancy for their property. Mr. Kurth claimed to Garten that he was the only individual capable of certifying the property for such a certificate.

According to the district court, this evidence combined to demonstrate that the arbitration clause facilitated Defendants' fraudulent scheme. The court explained that, under *Moseley v. Electronic & Missile Facilities, Inc.*, 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963), where "an arbitration clause was part and parcel of a fraudulent scheme" that allegation must be adjudicated before the claims are decided through arbitration. In this respect, the court found:

Similar to the Defendant in *Moseley*, Defendants in this case contrived a

accomplished in part with at least one forged

fraudulent scheme to charge Plaintiffs and others amounts far in excess of the amounts actually paid out to subcontractors for the same work which they undertook to obtain and supervise for a percentage fee. As one of the means used to effectuate this fraudulent scheme, Defendants included an arbitration provision in the contract which was intended to deprive Plaintiffs of their day in court and to intimidate Plaintiffs into giving Defendants additional payments because Defendant Kurth, as he expressly told Garten, "knows arbitration like the back of his hand" and "could represent himself" in such proceedings. Defendant Kurth specifically threatened Mr. Garten about proceeding to arbitration against him and warned that Mr. Garten would be better off paying Mr. Kurth additional funds which were not owed. These particularized facts show a substantial relationship between the arbitration provision and the rest of Defendants' fraudulent scheme which included concealment of Kurth's relationship with the bidders and falsification of billings, as well as filing of a false mechanic's lien. These particularized facts distinguish this case from cases such as *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), where the only issue is fraud in the inducement of the arbitration clause.

Accordingly, in an order dated March 26, 2001, the district court denied Defendants' motion to compel arbitration. Defendants appeal from that order.

## DISCUSSION

■■ We review the district court's determination of the arbitrability of Plaintiffs' claim *de novo*, while accepting the

invoice."

court's factual determinations unless clearly erroneous. *See, e.g., Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.,* 246 F.3d 219, 225 (2d Cir.2001); *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 295 (2d Cir.1999); *Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998).

The contracts at issue are governed by the Federal Arbitration Act ("FAA"). Design Works was located in Connecticut while the Gartens were located in New York; Architecture and Planning did business in multiple states; and the construction of the playhouse undoubtedly involved materials and labor in interstate commerce. *See Prima Paint,* 388 U.S. at 401, 87 S.Ct. 1801. As a result, the Gartens' contracts with Defendant Architecture and Planning and Defendant Design Works are clearly "contract[s] evidencing a transaction involving commerce" subject to the FAA, 9 U.S.C. § 4 (1994). *See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

█ Under the FAA, courts are required generally to resolve questions of arbitrability in favor of arbitration. *See CPR (U.S.A.) Inc. v.. Spray,* 187 F.3d 245, 254 (2d Cir.1999) ("The existence of a broad agreement to arbitrate . . . creates a presumption of arbitrability, which is overcome only if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " (quoting *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997))); *see also Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24, 103 S.Ct. 927. But, before the court compels arbitration of a claim, the court must find that a valid agreement to arbitrate exists. *See* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.,* 117 F.3d 655, 666 (2d Cir.1997).

█ Claims regarding fraud in a contract containing an arbitration clause are, for the most part, also subject to arbitration. *See, e.g., Campaniello,* 117 F.3d at 666. As the Court explained in *Moseley,* however, arbitration is not mandated where the arbitration clause is part of the fraudulent scheme—where it is used to carry out the fraud. *Moseley,* 374 U.S. at 171, 83 S.Ct. 1815. *Moseley* involved a contract with a broad arbitration clause entered into by a contractor and a subcontractor. The subcontractor brought suit seeking, *inter alia,* a) recovery of the amounts due under the subcontracts, b) recision on the subcontracts as fraudulent, and c) an injunction against the defendant's proceeding with arbitration in New York. *Id.* at 168–70, 83 S.Ct. 1815. The Supreme Court determined that the "issue of fraud should first be adjudicated before the rights of the parties under the subcontracts can be determined." *Id.* at 171, 83 S.Ct. 1815. More specifically, the Court explained that the district court, in considering the sufficiency of the pleadings, should consider the question of fraud only in the *arbitration clause itself*—"the issue goes to the arbitration clause itself, since it is contended that it was to be used to effect the fraudulent scheme." *Id.* As Chief Justice Warren explained in a concurring opinion:

> Fraud in the procurement of an arbitration contract, like fraud in the procurement of any contract, makes it void and unenforceable and [we agree] that this question of fraud is a judicial one, which must be determined by a court. To

allow this question to be decided by arbitrators would be to that extent to enforce the arbitration agreement even though steeped in the grossest kind of fraud.

*Id.* at 172, 83 S.Ct. 1815 (Warren, C.J., concurring).

The Court further developed its approach to the proper fora for adjudication of claims concerning fraudulent contracts in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). *Prima Paint* addressed the question "whether the federal court or an arbitrator is to resolve a claim of 'fraud in the inducement,' under a contract governed by the United States Arbitration Act of 1925." *Id.* at 396–97, 87 S.Ct. 1801. The Court held that such an allegation is properly adjudicated in arbitration. *Id.* at 404, 87 S.Ct. 1801. It noted that "no claim has been advanced ... [that defendant] fraudulently induced it to enter into the agreement to arbitrate," and that "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.* at 406, 404, 87 S.Ct. 1801. It concluded that, under 9 U.S.C. § 4, courts may not adjudicate "claims of fraud in the inducement of the contract generally." *Id.* at 404, 87 S.Ct. 1801.

The *Prima Paint* Court did not overrule *Moseley* and, in fact, noted that its ruling was "consistent ... with the decision in *Moseley.*" *Id.* at 404 n. 12, 87 S.Ct. 1801. We have recognized that some tension between the cases may exist and we have concluded that "the only way to reconcile *Prima Paint* with *Moseley* is to require some substantial relationship be-

tween the fraud or misrepresentation and the arbitration clause in particular." *Campaniello,* 117 F.3d at 667. This "substantial relationship," we have held, requires more than a mere claim that the "arbitration clause is an element of the scheme to defraud"; it must include "particularized facts specific to the ... arbitration clause which indicate how it was used to effect the scheme to defraud." *Id.* In this respect, the *Campaniello* court explained, "we read *Moseley* narrowly to give effect to the clearer language of *Prima Paint.*" *Id.*[5]

In the instant case, Defendants contend that no nexus between the arbitration clause and the fraudulent scheme was demonstrated by Plaintiffs. Their claim (in essence, that the "substantial relationship" required by *Campaniello* did not exist), challenges the district court's application of law to the facts of the case.

We agree with the district court, that in a case such as this, the court must first decide whether the arbitration clause is itself sufficiently connected with the alleged fraudulent scheme so as to be tainted by it. But, the only allegation of a link between the arbitration clause and the general fraud asserted by Plaintiffs rests on the threats made by Mr. Kurth regarding his experience with arbitration and the costs to Plaintiffs of proceeding in arbitration. While we accept the existence of these threats and of a grossly fraudulent scheme as valid findings of fact, we do not view the threats as sufficient to establish a "substantial relationship" between the arbitration provision and the fraud. As we said in *Campaniello,* "[a]ppellants may not [after *Prima Paint*] establish a connection

**5.** The Plaintiffs in *Campaniello* were trying to sue in district court in New York despite an arbitration clause requiring arbitration in Italy. They argued "that the remedies for fraud were 'more extensive' in New York than in Italy." *Campaniello,* 117 F.3d at 667. We

enforced the arbitration provision explaining that "[w]e do not consider such conclusory allegations sufficient to establish that the arbitration clause in particular was a tool used to further a scheme to defraud." *Id.*

between the alleged fraud and the arbitration clause in particular merely by adding the allegation that the arbitration clause was a part of the overall scheme to defraud." *Campaniello*, 117 F.3d at 667.

Mr. Kurth's statements regarding his position with respect to arbitration are little more than aggressive posturing. Analogous comments could be made in many construction situations. And, without more, such threats by the contractor that arbitration favors him do not suffice to show that the arbitration clause was used by the contractor as a weapon in the broader fraud—however gross that fraud may be. Indeed, if upheld, the district court's decision would permit future plaintiffs to avoid arbitration in all general fraud contexts merely by citing comments made by their adversaries regarding their perceived advantage in arbitration.

*Prima Paint*, in explaining and limiting *Moseley*, stated that "the purpose of [the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint*, 388 U.S. at 404 n. 12, 87 S.Ct. 1801. In the case at hand, there is nothing deficient in the arbitration clause itself. And, the facts that the clause will cover claims of gross fraud, that Defendants are more comfortable in arbitration than in court litigation, and that arbitration will be less expensive for Defendants than for Plaintiffs, do not—on their own—render the agreement to arbitrate suspect, let alone unenforceable. We do not, of course, reject the argument that post hoc evidence can support a finding of a substantial relationship between a general fraudulent scheme and the presence of an arbitration clause in a contract. We simply do not find such a relationship to have been shown in this case. As in *Campaniello*, "[t]here is no indication here that there was any misrepresentation or fraud related to the arbitration clause itself." *Campaniello*, 117 F.3d at 667.

Appellants also seek a stay with respect to the claims against the Non–Signatory Defendants. This appeal, however, is from the district court's Order of March 26, 2001, which decided the motion to compel arbitration between Plaintiffs and Defendants Architecture and Planning and Design Works. The Non–Signatory Defendants' motion to compel arbitration had previously been denied by the court's Order of October 23, 2000. None of the Non–Signatory Defendants have appealed from the October 23 decision. Accordingly, that judgment, in so far as it affects the Non–Signatory Defendants, is not properly before this court.

\* \* \*

We REVERSE the district court's order denying Appellants' motion to compel arbitration. We hold that Plaintiffs claims against Design Works and Architecture and Planning are subject to arbitration. We, however, decline to consider Appellants' request for a stay of the suit against the Non–Signatory Defendants pending that arbitration.